IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
February 9, 2021 Session

## STATE OF TENNESSEE v. CHARVARIS DONTE NEWSOM

**Appeal from the Criminal Court for Davidson County**
No. 2018-B-768      Steve R. Dozier, Judge
_____

### No. M2020-00681-CCA-R3-CD
_____

Following a jury trial, the Defendant, Charvaris Donte Newsom, was convicted of felony murder, second degree murder, and especially aggravated robbery. The trial court merged the second degree murder conviction into the felony murder conviction and imposed an effective sentence of life imprisonment. On appeal, the Defendant challenges (1) the sufficiency of the evidence; (2) the admission of evidence of his other criminal acts; (3) the admission of hearsay evidence from a police report; (4) the prosecutor's questioning of a detective and the Defendant regarding whether they believed witnesses were truthful; (5) the prosecutor's questioning the Defendant regarding his invocation of his right to remain silent and his failure to produce evidence and witnesses at trial; and (6) the prosecutor's comments during opening statements and closing arguments. The Defendant also seeks relief based upon cumulative error. Upon reviewing the record, the parties' briefs and oral arguments, and the applicable law, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, P.J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and ROBERT H. MONTGOMERY, JR., JJ., joined.

David Von Wiegandt (on appeal) and Leah Wilson (at trial), Nashville, Tennessee, for the appellant, Charvaris Donte Newsom.

Herbert H. Slatery III, Attorney General and Reporter; T. Austin Watkins, Assistant Attorney General; Glenn R. Funk, District Attorney General; and Chandler Harris and J. Wesley King, Assistant District Attorneys General, for the appellee, State of Tennessee.

# OPINION

## FACTUAL AND PROCEDURAL HISTORY

The evidence presented at trial established that on October 11, 2015, the Defendant shot the victim, Mr. Ian Patterson, once in the chest while the Defendant and his co-defendant and cousin, Mr. Quantarius Newsom, were robbing him.[1] The victim died as a result of the gunshot wound. The Defendant and Mr. Newsom were charged with felony murder during the perpetration of or attempt to perpetrate a robbery, first degree premeditated murder, and especially aggravated robbery. Mr. Newsom also was charged with theft of a separate victim's cell phone that Mr. Newsom used to arrange the robbery.

Mr. Newsom testified that he met the victim when they were housed together in a group home for juveniles for six or seven months. On October 11, 2015, the victim sent Mr. Newsom a message via Facebook, seeking to purchase a gun from him. Mr. Newsom agreed to sell a gun to the victim and arranged to meet the victim in the parking lot of James A. Cayce Homes, the apartment complex where Mr. Newsom lived in Nashville. Mr. Newsom communicated with the victim through Facebook and using a cell phone that Mr. Newsom had stolen on the previous day from a woman at Standard Candy Company, where Mr. Newsom was employed. Mr. Newsom called the victim four or five times and gave him directions.

Mr. Newsom testified that he told the Defendant that an acquaintance was coming to purchase a gun from him and that they could rob the man instead. The Defendant agreed to participate in the robbery. The Defendant suggested that once they entered the victim's car, the Defendant could act as if he were robbing both the victim and Mr. Newsom and then return Mr. Newsom's belongings following the robbery. Mr. Newsom did not believe the victim would be a threat, so he proposed that once he and the Defendant entered the victim's car, they "strong-arm" the victim, "rough him up, and take his stuff."

Mr. Newsom stated that he instructed the victim to meet him at the "new lot" at the apartment complex. Mr. Newsom and the Defendant met at the home of Mr. Newsom's mother, which was about a two-minute walk from the "new lot." They waited outside for the victim to arrive. Mr. Newsom said that he was unarmed and that the Defendant had a .40-caliber pistol, which Mr. Newsom had not seen previously. Mr. Newsom was wearing an orange shirt, and the Defendant was wearing a red hoodie.

---

[1] Because both the Defendant and the co-defendant share the same surname, we will refer to Charvaris Newsom as "the Defendant" and Quantarius Newsom as "Mr. Newsom."

Mr. Newsom testified that once the victim arrived, Mr. Newsom entered the victim's car on the front passenger side while the Defendant entered the back seat on the driver's side and sat behind the victim. The victim showed Mr. Newsom $350 in cash, put the money in the left pocket of gym shorts that he was wearing under his pants, and asked Mr. Newsom whether he had the gun. The Defendant asked Mr. Newsom whether he had seen the victim's money, and when Mr. Newsom confirmed that he had, the Defendant pulled out his gun and pointed it behind the victim's right ear. The victim turned around and saw the gun, and the Defendant told him, "[Y]ou know what this is." Mr. Newsom retrieved the victim's money from his pocket while the Defendant continued to point the gun at the victim. The Defendant instructed Mr. Newsom to grab the victim's cell phone in the center console because the Defendant feared that the victim would call the police. Mr. Newsom said he did not believe the victim would report the robbery to the police. The Defendant grabbed the victim's cell phone and exited the car.

Mr. Newsom stated that he opened the car door to leave and that when he had one foot out of the car, the victim put the car in reverse, striking Mr. Newsom with the car door. Mr. Newsom stumbled, and before he could stand up, he heard one gunshot and saw the Defendant with his gun in his hand. Mr. Newsom and the Defendant fled as the victim got out of his car seeking help.

Mr. Newsom and the Defendant returned to the home of Mr. Newsom's mother. They divided the proceeds of the robbery, with Mr. Newsom taking $200 and the Defendant taking $150. Mr. Newsom believed the Defendant kept the cell phone, but Mr. Newsom did not know what the Defendant did with the gun. Mr. Newsom called a cousin to come get them and told his cousin that the Defendant had shot someone. The Defendant left before the cousin arrived, and Mr. Newsom did not know where the Defendant went. Later that same evening, Mr. Newsom sent the Defendant a message via Facebook, asking the Defendant where he was. The Defendant said he was in Murfreesboro and instructed Mr. Newsom to delete all of his Facebook messages. A few days later, the Defendant told Mr. Newsom that he did not want to shoot the victim.

Mr. Newsom testified that when he and the Defendant were incarcerated, the Defendant gave him a handwritten note, which Mr. Newsom identified at trial. The Defendant stated in the note that in order to escape the charges, Mr. Newsom should maintain that a third person was outside of the car and that he should identify the person under a fake name, "Cayce Boy."

Mr. Newsom acknowledged that he was not truthful during his initial interview with police officers and explained that he was trying to protect his family. He stated that once officers began accusing one of his relatives who was not involved in the shooting, Mr. Newsom admitted that the Defendant was the shooter. Prior to the Defendant's trial,

Mr. Newsom met with the prosecutors and officers and executed an agreement whereby the State granted Mr. Newsom "use immunity" regarding any statements made during the meeting. Mr. Newsom acknowledged that no agreement had been reached to settle his pending charges, that he wanted to tell the truth, and that he was prepared to accept responsibility for his actions.

On cross-examination, Mr. Newsom agreed that he hoped his testimony would help him receive a favorable result regarding his pending charges. He testified that during his exchange with the victim on Facebook, the victim stated he was thinking about robbing Mr. Austin Hooper, a mutual acquaintance. Mr. Newsom acknowledged that he identified "D. Brown" as the shooter when he first met with officers. Mr. Newsom first told the officers that he never got into the victim's car but remained on some nearby stairs. He later stated that while he was inside the victim's car, "D. Brown" was the shooter, and Mr. Newsom identified "D. Brown" in a photographic lineup. Mr. Newsom stated that he was truthful with the officers once the officers attempted to implicate one of Mr. Newsom's relatives who was not involved. He agreed that the officers told him that he could help his case by being truthful. On redirect examination, Mr. Newsom testified that the officers never told him that his charges would be dismissed if he identified the shooter.

Ms. Theressa Parker testified that on October 11, 2015, she was watching outside the window of her apartment at James A. Cayce Homes when she saw a small white car, which she had previously never seen, drive into the parking lot. A short time later, she heard a loud noise that sounded as if someone was slamming a car door. She looked outside and saw a Caucasian man standing outside with the car door open and two African-American men running from the car. The two African-American men ran up the steps and into an apartment. Ms. Parker noted that one of the men was wearing an orange shirt and that the other man was wearing a red shirt. She was unable to see their faces and could not identify them.

Ms. Parker stated that the Caucasian man reentered the car but did not shut the door. He backed up the car, drove over the curb, and continued to drive into the grass until he struck a tree. Two neighbors tried to help the man, and an ambulance and police officers came to the scene.

On cross-examination, Ms. Parker testified that the incident occurred during the daytime. She was sitting on the edge of her bed and looking outside her window when the car drove into the parking lot. She heard the noise two or three minutes later while she was watching television. She did not know whether the shirts worn by the two African-American men had writing and explained that she caught a "glimpse" of the color of their shirts as they were fleeing.

Mr. Austin Hooper resided with the victim and Mr. Newsom at a children's home for several months in 2015. Mr. Hooper testified that on the morning of October 11, 2015, he was with the victim at a hotel in the northern area of Davidson County and learned that the victim was planning on meeting Mr. Newsom. The victim counted $1,000 in cash in front of Mr. Hooper and put the money in his front pocket. Later that day, Mr. Hooper learned that the victim had been killed. Shortly thereafter, Mr. Newsom blocked Mr. Hooper from viewing Mr. Newsom's profile on Facebook. Three days after the shooting, Mr. Hooper met with police officers and identified Mr. Newsom in a photographic array. On cross-examination, Mr. Hooper testified that although the victim did not tell him what he planned to purchase with his money, Mr. Hooper believed the victim planned to purchase cocaine.

Officers and personnel with the crime scene unit of the Metropolitan Nashville Police Department ("MNPD") arrived at the scene of the shooting and observed a white Pontiac Grand Am parked in the grass in front of Building 51 of the apartment complex. A substance that appeared to be blood was in the driver's seat and on the rear driver's side door. Officers collected a .40-caliber Hornady cartridge casing on the ground in an empty parking space in front of Building 51. Officers also collected the victim's clothing from the hospital, and Officer Kenneth Wolfe observed a hole in the victim's shirt, which Officer Wolfe said was consistent with a gunshot entry wound.

MNPD Officer Charles Linville of the crime scene unit processed the victim's white Pontiac Grand Am and lifted fingerprints from the rear door on the driver's side. Ms. Monica Kent, a forensic scientist latent print examiner with MNPD's crime laboratory, determined that the fingerprints matched those of the Defendant.

Dr. Miguel Laboy performed the victim's autopsy and testified that the seventeen-year-old victim was pronounced dead at the hospital on October 11, 2015, at 12:48 p.m. Dr. Laboy stated that the victim sustained a gunshot wound to the left side of his chest. Dr. Laboy observed gun powder stippling around the entry wound and determined that the gun was fired from an intermediate range. The bullet traveled from left to right, slightly downward, and slightly back to front. The bullet struck multiple major organs, including the spleen and the liver, and perforated the diaphragm. The victim lost a large amount of blood at a fast rate, and the blood constricted the lungs, making it difficult to breathe. Dr. Laboy recovered a large caliber, deformed jacketed bullet from the right side of the victim's abdomen. He concluded that the victim's cause of death was a gunshot wound to the left side of his chest and that the manner of death was homicide.

Mr. Dwaine Logan testified that at around 11:00 p.m. on October 11, 2015, he was robbed outside of his home by two African-American men, one of whom he believed was wearing a red shirt. Mr. Logan stated that both men had guns and that one of the men

kept his gun tucked into his pants. Mr. Logan recalled that he had returned home from work and was getting out of his car, a Nissan Sentra, when one of the men approached him and asked if Mr. Logan knew anyone who sold marijuana. When Mr. Logan stated that he did not, the man pulled out what appeared to be a .40-caliber gun. The men took $20 from Mr. Logan, his car keys, and his car.

Mr. Logan testified that he entered his second-story apartment and informed his wife and his brother of the robbery. When Mr. Logan's brother looked outside, one of the men shot into the apartment. The bullet entered the apartment and went through the sleeve of the jacket that Mr. Logan's wife was wearing. Crime scene officers with the MNPD responded to Mr. Logan's apartment where they collected a .40-caliber PPU spent cartridge casing in the parking lot in front of the apartment building and a projectile in the apartment.

Officers later recovered Mr. Logan's car, which had been wrecked. Mr. Logan confirmed that the car was not in a wrecked condition when the men took it. He gave a "vague" description of the two men to officers, describing one man as "chubby" and one man as thin and stating that they were both wearing hoodies. Officers showed Mr. Logan a photographic array, but he was unable to identify any of the perpetrators.

On cross-examination, Mr. Logan agreed that during the robbery, one of the men was eight to ten feet away from him. He did not recall at trial the color of the shirts that the perpetrators were wearing but stated that he was able to recall their clothing when he spoke to the police. He stated that if he told the officers that one of the men was wearing a red shirt, the man "probably had one on." Mr. Logan agreed that both men were wearing black hoodies. On redirect examination, the prosecutor showed Mr. Logan a police report in an effort to refresh his recollection. Mr. Logan read from the report that one of the men was wearing a black zip-up hoodie and that the other man was wearing a "red/white zip-up hoodie." Mr. Logan testified that while he could not recall at trial what the men were wearing, his description of the perpetrators' clothing to the officers shortly after the robbery would have been correct.

Mr. Ryan Kent, the supervisor of the firearm and tool mark identification unit with the MNPD, was accepted by the trial court as an expert in firearm and tool mark examination. Mr. Kent examined the spent cartridge casing found at the scene of the victim's shooting, the projectile removed from the victim's body, and the spent cartridge casing and projectile found at the scene of the robbery of Mr. Logan. Mr. Kent entered images of the spent cartridge casing from the victim's shooting into the National Integrated Ballistic Information Network ("NIBIN"), a database that searches images to determine whether the same firearm was used in multiple incidents or whether the firearm had been recovered. The results indicated that "[a]ssociation was made" with the

spent cartridge casing recovered from the scene of Mr. Logan's robbery. Mr. Kent examined the two spent cartridge casings and determined that they were fired from the same firearm.

Mr. Kent testified that the projectile recovered from the victim's body was consistent with a .40-caliber or ten-millimeter projectile. He microscopically compared the projectile from the victim's body with the projectile recovered from Mr. Logan's apartment and concluded that they were fired from the same firearm. He stated that he could not determine whether a projectile and spent cartridge casing were fired from the same firearm without the firearm from which to test them. Mr. Kent summarized his findings by explaining that he was able to determine that the projectiles were fired from the same firearm and that the spent cartridge casings were fired from the same firearm but that he was unable to determine whether the same firearm was used to fire both the projectiles and the spent cartridge casings.

MNPD Detective Jesse Holt testified that he was assigned to investigate an attempted aggravated robbery that occurred on October 15, 2015, on Queen Street in Davidson County. Officers had a "vague" description of the vehicle involved, and they were involved in a high-speed chase of the vehicle. Mr. Logan's wrecked car, which was stolen on October 11th, was recovered near the scene of the attempted aggravated robbery on October 15th. Mr. Benjamin Deblanc, a forensic scientist with MNPD's forensic biology unit, tested two red stains on the driver's side airbag. The two stains were presumptively positive for blood, but the confirmatory tests were negative. As a result, Mr. Deblanc could not positively state that the stains were blood. He was able to produce a full DNA profile from one stain and a partial DNA profile from the other stain. Both profiles matched the Defendant's DNA.

MNPD Detective Adam Weeks was the lead detective in the investigation of the victim's homicide. He testified that he obtained the victim's cell phone records and noted that on October 11th beginning at 10:02 a.m., the victim exchanged calls with a number beginning with "554" for approximately one hour. Detective Weeks investigated the "554" cell phone number and determined that it belonged to a cell phone that had been stolen from Ms. Betty Langoya while she was at Standard Candy Company. Detective Weeks identified surveillance video showing Mr. Newsom taking the cell phone from the company's break room. Mr. Newsom was wearing a white shirt and was holding an orange shirt.

Detective Weeks also obtained the records from the victim's Facebook account, which showed that the victim exchanged a series of messages with Mr. Newsom on October 11th from around 7:00 a.m. until 9:02 a.m. According to the records, the victim sent Mr. Newsom a message, asking where he could obtain a "strap," which Detective

Weeks explained was a gun. Mr. Newsom replied, "Yeah, what's up?" The victim asked, "How much you taxing on one?" Detective Weeks explained that the victim asked Mr. Newsom for the price of the gun. The victim stated that he was thinking about "upping on Austin." Mr. Newsom asked the victim whether he was coming to retrieve the gun, and the victim responded that he would and that he had purchased "a quarter of the white in the last two days." The victim stated that he would come immediately, and Mr. Newsom gave the victim a telephone number to call for directions.

Following Mr. Newsom's arrest, he waived his rights and agreed to speak to Detective Weeks. Based on information obtained from Mr. Newsom, the Defendant was arrested. The Defendant waived his rights and agreed to speak to Detective Weeks. The Defendant denied knowing the victim or ever being in the victim's car, and the Defendant maintained that he had not been to James A. Cayce Homes for several weeks. When Detective Weeks informed the Defendant that his fingerprint was recovered on the victim's car, the Defendant did not offer an explanation. When Detective Weeks told the Defendant that others had stated that he was involved in the shooting, the Defendant replied that those people were jealous of him. Detective Weeks testified that once he presented the Defendant with Mr. Newsom's statement, "[s]hortly after that, he decided not to speak with us any longer." In March of 2018, Detective Weeks showed Mr. Logan a photographic lineup, but Mr. Logan was unable to make an identification.

Detective Weeks testified that in October 2016, a note was found inside Mr. Newsom's jail cell. Detective Weeks had multiple examples of the handwriting of Mr. Newsom and the Defendant and stated that "as a layperson," the handwriting on the note looked "very similar" to the Defendant's handwriting.

On cross-examination, Detective Weeks testified that Mr. Newsom took the cell phone approximately twelve hours before the victim was killed. Detective Weeks arrested and interviewed Mr. Newsom on October 21, 2015. Detective Weeks stated that although he could not recall the number of different versions of events that Mr. Newsom presented during the interview, Mr. Newsom did not immediately admit to having a role in the victim's death. Detective Weeks agreed that once Mr. Newsom admitted he was involved, he "down play[ed]" his role and identified "D. Brown" as the shooter. When officers asked Mr. Newsom about another cousin, Mr. Newsom denied that the cousin was involved and admitted that the Defendant was the shooter shortly thereafter.

On redirect examination, Detective Weeks agreed that although Mr. Newsom was untruthful initially, Detective Weeks believed Mr. Newsom's final version of the events. Detective Weeks explained his belief by noting that Mr. Newsom implicated himself as heavily involved in the victim's death and that Mr. Newsom's final statement was consistent with the evidence recovered during the investigation, including the physical

evidence recovered from the vehicle, the statements of other witnesses, the bullet trajectory, the Facebook data, and the cell phone records. Detective Newsom testified that Mr. Newsom continued to stand by his final version of the events in subsequent interviews. On recross examination, Detective Weeks denied promising Mr. Newsom help with his criminal charges if Mr. Newsom provided additional information. Rather, Detective Weeks told Mr. Newsom that it is "always more helpful if we talk about everything and get everything out." Detective Weeks denied making a deal with Mr. Newsom in exchange for his statement.

Detective Joseph High with MNPD's surveillance and investigative support unit was accepted by the trial court as an expert in the field of call detail record analysis. He testified that he received cell phone records for a cell phone subscribed to the victim's mother and examined the activity from 10:00 a.m. on October 11, 2015, until midnight on October 12th. According to the records, at 10:02 a.m., the cell phone received an incoming call from the number assigned to the cell phone stolen by Mr. Newsom, and the call lasted one minute and eight seconds. The cell tower used was located off Interstate 24 at the Montgomery County and Cheatham County lines, located northwest of Davidson County. At 10:24 a.m., the cell phone received an incoming call from the same number that lasted thirty-three seconds. The cell tower used was located off of Interstate 24 in Cheatham County near the Davidson County line, and Detective High stated that the location of the cell tower was consistent with the user traveling toward Davidson County. At 10:49 a.m., the cell phone received an incoming call from the same number that lasted fifty-two seconds, and the cell phone communicated with a cell tower located on the east side of the river near downtown Nashville, which Detective High said was around the area of James A. Cayce Homes. At 10:57 a.m., the cell phone received an incoming call from the same number, and the cell tower used was around the same area. Detective High stated that based upon the records, the cell phone appeared to have been turned off around noon and that no additional data after that time period was available for him to analyze.

Officer Heather Ainsworth of the Davidson County Sheriff's Office testified that on October 1, 2016, she located a note tucked in a blanket underneath a mat in Mr. Newsom's jail cell. Ms. Kent conducted a limited fingerprint analysis of the note and determined that two of the fingerprints on the note belonged to the Defendant. Mr. Tom Vastrick, a forensic document examiner, compared the handwriting on the note with handwriting samples from the Defendant and Mr. Newsom and found "to the highest degree of probability" that the handwriting on the note matched the Defendant's handwriting and that it was "highly probable" that Mr. Newsom did not write the note.

The Defendant testified in his own defense that on October 11, 2015, at approximately 10:45 a.m., his cousin, Mr. Newsom, called and stated that someone had

contacted him to purchase drugs and that Mr. Newsom was waiting in the "new lot" for the person to arrive. The Defendant went to the area where he saw a few people sitting on a curb and Mr. Newsom sitting inside a car. The Defendant stated that he was standing by the driver's side of the car and attempted to enter when Mr. Newsom stopped him and said they were exiting the car. The Defendant said that once Mr. Newsom and the victim exited the car, the victim asked the Defendant for "white girl" or cocaine and gave him a one-hundred-dollar bill. The Defendant stated that he had never seen the victim before that day. Once the transaction was completed, the Defendant went to a friend's house. The Defendant denied killing the victim or hearing a gunshot. He later heard around the neighborhood that someone had been shot in the "new lot," and he saw Mr. Newsom's arrest on the news.

The Defendant acknowledged driving Mr. Logan's car, which was later found wrecked, but maintained that he only drove it a few days prior to the wreck. He stated that he had been taking Xanax on the day in which he drove the car, so he could not recall the car's model. A friend arrived in the car and allowed the Defendant to drive it.

The Defendant acknowledged writing the note found in Mr. Newsom's jail cell but maintained that the note was in response to a message that he received from Mr. Newsom. The Defendant maintained that he wrote the note in an effort to persuade Mr. Newsom to tell the truth about the shooting and the Defendant's lack of involvement. The Defendant noted that he also was afraid that he would be charged with selling drugs.

On cross-examination, the Defendant testified that he was at Mr. Darrell Pickett's home when Mr. Newsom contacted the Defendant though Facebook. The Defendant asserted that Mr. Pickett would verify the Defendant's testimony and that Mr. Pickett was in the courtroom at the time of the trial. The Defendant agreed that he did not tell Detective Weeks about being at Mr. Pickett's house and explained that he did not want to tell Detective Weeks that he was selling drugs. The Defendant clarified that he had not been to James A. Cayce Homes for several weeks from the time of the interview with police and not from the time of the shooting. The Defendant agreed that he told Detective Weeks that he was not near the victim or the victim's car on the day of the shooting.

The Defendant denied robbing the victim or possessing a gun during the drug deal, explaining that he trusted Mr. Newsom's judgment that the person who wanted to purchase drugs was "all right." The Defendant also denied wearing red clothing on the day of the shooting and said he was wearing a black jacket. He did not believe Mr. Newsom killed the victim. The Defendant recalled that he and Mr. Newsom were passing notes while in jail when Mr. Newsom wrote that he should have told the police about "Cayce Boy." The Defendant did not know who "Cayce Boy" was and testified

that he did not tell Detective Weeks about "Cayce Boy" because the Defendant was unaware of the information at the time of his interview with the officers.

The Defendant agreed that he was inside Mr. Logan's car at the time of the accident on October 15, 2015, but denied any knowledge of an aggravated robbery. The Defendant did not recall anything about the accident because he had been taking Xanax and was "highly intoxicated." He identified the man who arrived in the car prior to the accident as "Du Funny" but was unable to recall the man's real name.

In rebuttal, the State recalled Detective Weeks, who testified that the Defendant did not appear to be intoxicated during his interview. The Defendant maintained throughout the interview that he was not present at the time of the shooting and that he had not seen Mr. Newsom in a significant amount of time. Detective Weeks stated that the Defendant never told him about Mr. Pickett, that Detective Weeks knew Mr. Pickett, and that Detective Weeks did not see Mr. Pickett in the courtroom.

The jury convicted the Defendant of felony murder during the perpetration of or attempt to perpetrate a robbery, second degree murder as a lesser-included offense of first degree premeditated murder, and especially aggravated robbery. The trial court merged the second degree murder conviction into the felony murder conviction and imposed an effective sentence of life imprisonment. The Defendant filed a motion for new trial, which the trial court denied following a hearing. The Defendant then filed a notice of appeal in this court.

On appeal, the Defendant challenges (1) the sufficiency of the evidence; (2) the admission of evidence of the aggravated robbery of Mr. Logan and the attempted aggravated robbery after which Mr. Logan's vehicle was wrecked; (3) the admission of hearsay evidence from a police report regarding the description of the perpetrator's clothing; (4) the prosecutor's questioning a detective and the Defendant regarding whether they believed witnesses were truthful; (5) the prosecutor's questioning the Defendant regarding his invocation of his right to remain silent and his failure to produce evidence and witnesses at trial; and (6) the prosecutor's comments during opening statements and closing arguments. The Defendant also seeks relief based upon cumulative error.

## ANALYSIS

### I. Sufficiency

The Defendant asserts that the evidence is insufficient to support his convictions. Specifically, he asserts that the evidence fails to establish that he participated in the

commission of the offenses, that Mr. Newsom's testimony was not credible, and that the Defendant's testimony was "more consistent with the facts than [Mr. Newsom's] explanation." The State responds that the evidence is sufficient to support the convictions. We agree with the State.

When a defendant challenges the sufficiency of the evidence, the relevant question for this court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). On appeal, "'the State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom.'" *State v. Elkins*, 102 S.W.3d 578, 581 (Tenn. 2003) (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Therefore, this court will not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Instead, it is the trier of fact, not this court, who resolves any questions concerning "the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). The burden is then shifted to the defendant on appeal to demonstrate why the evidence is insufficient to support the conviction. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). This court applies the same standard of review regardless of whether the conviction was predicated on direct or circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 381 (Tenn. 2011). "Circumstantial evidence alone is sufficient to support a conviction, and the circumstantial evidence need not exclude every reasonable hypothesis except that of guilt." *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012).

As it relates to the present case, felony murder is the "killing of another committed in the perpetration of or attempt to perpetrate any … robbery." T.C.A. § 39-13-202(a)(2). Second degree murder is the "knowing killing of another." T.C.A. 39-13-210(a)(1). Especially aggravated robbery is a robbery that is "[a]ccomplished with a deadly weapon" and "[w]here the victim suffers serious bodily injury." T.C.A. § 39-13-403(a). "Robbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear." T.C.A. § 39-13-401(a).

The Defendant does not challenge the sufficiency of the evidence as it relates to the elements of the offenses. Rather, he challenges the sufficiency of the evidence establishing his identity as a perpetrator. Identity is an essential element of every crime. *State v. Bell*, 512 S.W.3d 167, 198 (Tenn. 2015). The identification of the perpetrator of a crime is a question of fact for the jury. *State v. Thomas*, 158 S.W.3d 361, 388 (Tenn.

2005). In resolving questions of fact, such as the identity of the perpetrator, "'the jury bears the responsibility of evaluating the conflicting evidence and accrediting the testimony of the most plausible witnesses.'" *State v. Pope*, 427 S.W.3d 363, 369 (Tenn. 2013) (quoting *State v. Hornsby*, 858 S.W.2d 892, 897 (Tenn. 1993)).

When viewed in the light most favorable to the State, the evidence presented at trial established that Mr. Newsom agreed to sell the victim a gun, devised a plan to rob the victim instead, and obtained the Defendant's assistance in committing the robbery. Mr. Newsom testified that while inside the victim's car, the Defendant held the victim at gunpoint while Mr. Newsom removed money from the victim's pocket. The Defendant then took the victim's cell phone. Mr. Newsom stated that while he was exiting the victim's car, the victim put the car in reverse, striking Mr. Newsom with the car door. Mr. Newsom said that as he was attempting to regain his balance, the Defendant shot the victim, and Mr. Newsom and the Defendant fled the scene.

Mr. Newsom testified that he was wearing an orange shirt and that the Defendant was wearing a red hoodie. Ms. Parker reported seeing two African-American men, one wearing an orange shirt and the other wearing a red shirt, fleeing the scene following the shooting. The Defendant's fingerprints were on the driver's side rear door of the victim's car, which was the same door that Mr. Newsom testified the Defendant used to enter the car. The spent cartridge casing found at the scene was fired from the same gun used to fire a spent cartridge casing found at the scene of a shooting and robbery later that same night. The bullet recovered from the victim's body was fired from the same gun used to fire a bullet recovered from the scene of the subsequent robbery. The Defendant's blood was on the driver's side airbag of the car that was taken during the subsequent robbery and was wrecked and recovered by police a few days later.

The Defendant admitting at trial to being at the scene prior to the victim's shooting and to driving the car taken during the subsequent robbery. His testimony was inconsistent with his prior statements to police in which he denied being at the scene of the shooting. The Defendant also wrote a note to Mr. Newsom at jail urging Mr. Newsom to make up a person to blame for the victim's death. Although the Defendant asserts that Mr. Newsom's testimony was not credible and that the Defendant's testimony was more consistent with the other evidence, the jury, in convicting the Defendant of the offenses, credited Mr. Newsom's testimony over that of the Defendant. Determinations of credibility are within the province of the jury, and this court will not disturb the jury's credibility determinations on appeal. *Bland*, 958 S.W.2d at 659. We conclude that this evidence is sufficient to establish the Defendant's identity as the perpetrator.

## II. Admission of Evidence of the Defendant's Other Criminal Acts

The Defendant maintains that the trial court erred in admitting evidence of the subsequent robbery of Mr. Logan on the night after the victim's shooting pursuant to Tennessee Rule of Evidence 404(b). The Defendant asserts that the evidence was not probative to the issue of identity and was unfairly prejudicial. He also asserts that the State improperly questioned a witness about an attempted aggravated robbery that occurred four days after the victim's shooting when the trial court ruled during a pretrial hearing that such evidence was inadmissible at trial. The State responds that the trial court properly admitted evidence of Mr. Logan's robbery as probative to the issue of identity. The State further responds the State's questioning of a witness about the separate attempted aggravated robbery was proper because the trial court found that evidence was admissible. We agree with the State.

### A. Pretrial Proceedings

Prior to trial, the State filed a request for a hearing to determine the admissibility pursuant to Rule 404(b) of evidence of Mr. Logan's robbery that occurred twelve hours after the victim's shooting and the attempted aggravated robbery that occurred four days after the victim's shooting. The State explained that "a witness," who was identified at the pretrial hearing as Mr. Logan, would testify that a person, who was wearing red clothing and "favor[ed]" a photograph of the Defendant, robbed him of his 2007 Nissan Sentra and fired a gun through Mr. Logan's apartment. The State noted that Mr. Logan was shown a photographic lineup and identified a photograph of the Defendant as resembling the robber but that Mr. Logan said he could not be certain of the identification because the suspect's teeth could not be seen in the photograph. Officers recovered a spent cartridge casing and the projectile and entered them into the NIBIN database, which resulted in a "presumptive positive hit" linking the robbery to the victim's shooting. The crime laboratory confirmed that the cartridge casings recovered from the scene of the victim's shooting and the scene of Mr. Logan's robbery were fired from the same gun. Mr. Logan's Nissan Sentra was recovered four days later, and officers determined that the car had been used in an attempted aggravated robbery. The Defendant's DNA was found inside Mr. Logan's car.

The State argued that evidence of Mr. Logan's robbery and the attempted aggravated robbery were relevant to the issue of the identity of the Defendant as the shooter of the victim. The State maintained that the proof of the subsequent offenses corroborated the statement of a witness to the victim's shooting regarding the Defendant's clothing, the type of gun used, and the Defendant's taking the gun with him when he fled the scene.

- 14 -

During a pretrial hearing, MNPD Detective Jesse Holt testified to the attempted aggravated robbery that occurred on Queen Avenue during the early morning hours of October 15, 2015. Detective Holt stated that the victim of the attempted robbery fired shots at the perpetrators in self-defense. Shortly thereafter, officers pursued a dark-colored car but were unable to capture it. A car matching the description of the car pursued by the officers was discovered a short time later, and the car had been wrecked and abandoned. The car had been shot, which Detective Holt stated was consistent with the victim of the attempted robbery firing shots at the vehicle. The car, a 2007 Nissan Sentra, was stolen from Mr. Logan on October 11th, a few days before the attempted robbery on Queen Street.

Detective Holt testified that when the car was processed, swabs were taken from an airbag and that blood was determined to be on the swabs. The DNA profile obtained from the swabs was entered into CODIS, and a search resulted in a presumptive positive hit of the Defendant's DNA. Detective Holt stated that a search warrant was executed to obtain buccal swabs from the Defendant. Testing of the Defendant's DNA confirmed that the blood from the airbag belonged to the Defendant.

Detective Holt testified that shortly before officers discovered the wrecked car, a man called police and reported that he had been robbed and kidnapped on Burrus Street, which was near the location where officers discovered the wrecked vehicle. The perpetrators attempted to take the kidnapping victim's car but were unable to drive a stick shift. They forced the kidnapping victim into his vehicle and made him drive around to several different locations. Officers subsequently processed the kidnapping victim's vehicle and discovered the Defendant's blood inside the vehicle.

On cross-examination, Detective Holt testified that the call regarding the attempted robbery on Queen Avenue came in just after midnight on October 15th. The kidnapping victim called the police at 1:44 a.m., but officers were able to determine that the kidnapping occurred prior to 1:05 a.m., which was the timestamp reflected on an ATM to which the perpetrators forced the kidnapping victim to drive. The kidnapping victim reported the kidnapping after the perpetrators had him drop them off at a neighborhood.

The trial court summarized the evidence that the State sought to present as set forth in the State's notice, including evidence that the victim's shooter was wearing a red shirt, that Mr. Logan was robbed of his car and shot at by a person wearing a red shirt approximately twelve hours after the victim's shooting, that the cartridge casings recovered from the victim's shooting and Mr. Logan's robbery were fired from the same firearm, and that Mr. Logan's wrecked car with the Defendant's DNA inside was recovered four days later. The trial court noted that some of this proof was not presented

during the evidentiary hearing but that the State had affirmed that it planned to present such evidence at trial. The trial court found that the evidence was "highly probative" to the issue of the identity of the victim's shooter and that "when you weigh that, it's not unfair[ly] prejudic[ial] to the point that it excludes that evidence because of how highly probative identification is in the [victim's] homicide." The trial court also noted that the fact that the subsequent offenses occurred within hours or days, as opposed to weeks or months, after the victim's shooting also established that the evidence was "highly probative."

The trial court prohibited the State from presenting evidence that Mr. Logan identified the Defendant as the perpetrator, that Mr. Logan stated that a photograph of the Defendant in the lineup looked like the perpetrator, or that Mr. Logan stated that he needed to see the person's teeth before making a proper identification. The trial court found that such proof failed to establish an identification by Mr. Logan by clear and convincing evidence and that the proof amounted to a "non identification." The trial court also excluded evidence regarding the kidnapping that occurred on Burrus Street on October 15th, finding that the evidence was cumulative to other proof to be presented and that the admission of such evidence could increase the prejudice of the admission of the proof of the other criminal acts. Rather, the trial court limited the State's proof to the robbery of Mr. Logan and "the situation with … Queen Avenue and [the recovery of] the DNA."

## B. Analysis

"Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait." Tenn. R. Evid. 404(b). Rule 404(b) has been described as a rule of exclusion rather than inclusion. *State v. Jones*, 450 S.W.3d 866, 891 (Tenn. 2014). "Trial courts have been encouraged to take a 'restrictive approach of [Rule] 404(b) ... because "other act" evidence carries a significant potential for unfairly influencing a jury.'" *Id*. (quoting *State v. Dotson*, 254 S.W.3d 378, 387 (Tenn. 2008)).

Evidence of other acts may be admissible for other non-propensity purposes, such as "to establish motive, intent, identity, absence of mistake, or common plan or scheme," or contextual background. *State v. Little*, 402 S.W.3d 202, 210 (Tenn. 2013); *see* Tenn. R. Evid. 404(b), Advisory Comm'n Cmts. Evidence may be admitted for these purposes if the following requirements have been met:

(1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b).

If the trial court has substantially complied with the procedure mandated by Rule 404(b), a trial court's decision to admit or exclude evidence pursuant to Rule 404(b) is reviewed under an abuse of discretion standard. *State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997). A trial court abuses its discretion when "'it applies an incorrect legal standard or its decision is illogical or unreasonable, is based on a clearly erroneous assessment of the evidence, or utilizes reasoning that results in injustice to the complaining party.'" *Jones*, 450 S.W.3d at 892 (quoting *State v. Adams*, 405 S.W.3d 641, 660 (Tenn. 2013)). If the trial court has failed to substantially comply with the procedural mandates of Rule 404(b), our standard of review is de novo. *State v. Mallard*, 40 S.W.3d 473, 486 n.13 (Tenn. 2001) (citing *DuBose*, 953 S.W.2d at 652-53).

The Defendant asserts that because evidence regarding the robbery of Mr. Logan was not presented during the hearing, the trial court failed to substantially comply with the procedure mandated by Rule 404(b), and, therefore, the abuse of discretion standard does not apply. The State responds that the Defendant did not object at the hearing or argue that the State failed to establish the offenses by clear and convincing evidence due to the lack of testimony at the hearing. The State further responds that the trial court's decision based upon the statements and arguments of counsel setting out the proposed evidence was not improper.

In *State v. Denise Dianne Brannigan*, this court rejected the defendant's claim that the trial court failed to substantially comply with the procedure in Rule 404(b) when the State did not present any witnesses at the hearing and the trial court, instead, relied upon the prosecutor's statement as to what the evidence would establish. No. E2011-00098-CCA-R3-CD, 2012 WL 2131111, at *9 (Tenn. Crim. App. June 13, 2012). In upholding the trial court's ruling, this court recognized that "[m]otions in limine, which a Rule 404(b) motion is, are frequently decided merely on the basis of statements or arguments of counsel setting out the proposed evidence." *Id.* (citation omitted). This court concluded that the trial court "was adequately informed about the evidence that the State

sought to admit at trial when it made its ruling" and noted that the trial court explained that the defendant's failure to make a timely objection to the admission of the evidence prevented the trial court from conducting a "full-blown" hearing. *Id.*

A few months later, however, the Tennessee Supreme Court released its opinion in *State v. Sexton*, 368 S.W.3d 371, 402-04 (Tenn. 2012), in which the court held that in admitting evidence of the defendant's prior sexual abuse of the murdered victims' minor daughter pursuant to Rule 404(b), the trial court improperly relied upon the transcript of the preliminary hearing submitted by the State and on hearsay testimony about the abuse rather than witnesses with first-hand knowledge. Our supreme court explained that the State had the burden of persuasion regarding the admissibility of evidence pursuant to Rule 404(b) and that by failing to produce witnesses with first-hand knowledge to testify at the hearing, "the State risked being unable to satisfy the requisite standard." *Sexton*, 368 S.W.3d at 404. The court concluded that the inadequacy of the proceeding, alone, did not serve as a basis for excluding the evidence "absent any indication that the [d]efendant suffered a disadvantage for lack of a more extended hearing." *Id.* Nevertheless, the court held that because the trial court failed to receive the testimony and failed to state on the record whether the prior abuse was established by clear and convincing evidence, the trial court did not substantially comply with the procedure set forth in Rule 404(b), and the trial court's ruling was not entitled to deference on appeal. *Id.*

Unlike the defendant in *Sexton*, the Defendant in the present case never objected to either the State's failure to produce witnesses to testify during the evidentiary hearing regarding the robbery of Mr. Logan or the trial court's reliance upon the State's summary of the evidence in determining that the evidence was admissible. The Defendant never argued at the hearing that the State failed to meet its burden of establishing the subsequent robbery by clear and convincing evidence due to the State's failure to present witnesses. Rather, defense counsel's arguments during the hearing were based upon the premise that the evidence to be presented was accurately described by the State and that, nevertheless, such evidence failed to meet the requirements of Rule 404(b). The court in *Sexton* did not mandate the State to present witnesses during the evidentiary hearing but only warned that "the State risked being unable to satisfy the requisite standard" by failing to do so. *Sexton*, 368 S.W.3d at 404. In light of the Defendant's failure to object during the evidentiary hearing, we cannot conclude that by relying upon the State's summary, the trial court failed to substantially comply with the procedure set forth in Rule 404(b).

Furthermore, although Mr. Logan was unable to recall at trial the clothing worn by the perpetrators, the Defendant did not establish that he "suffered a disadvantage for lack

of an extended hearing" such that exclusion of the evidence was warranted. *Id.* In admitting the evidence, the trial court acknowledged that Mr. Logan was unable to identify the Defendant as one of the perpetrators in a photographic lineup but noted the ballistic evidence linking the Defendant to the victim's shooting and the subsequent robbery and the DNA evidence found in Mr. Logan's car. The State's summary submitted to the trial court of the ballistic evidence and DNA evidence connecting the Defendant to the subsequent robbery was consistent with the evidence presented at trial. The Defendant did not request that the trial court reconsider its ruling once Mr. Logan testified that he was unable to recall the clothing worn by the perpetrators.

The trial court found that the evidence was material to the issue of the Defendant's identity as the victim's shooter and that the probative value of the evidence was not outweighed by the danger of unfair prejudice. Although the trial court did not specifically state that the Defendant's commission of the subsequent robbery was established by clear and convincing evidence, the trial court summarized the evidence sought to be admitted and excluded a portion of the proof as not established by clear and convincing evidence. By doing so, the trial court implicitly found that the remaining acts were established by clear and convincing evidence. Accordingly, we conclude that the trial court substantially complied with the procedure set forth in Rule 404(b) and that the trial court's findings are entitled to deference on appeal.

The Defendant contends that the State improperly referred to the attempted aggravated robbery that occurred on Queen Avenue in questioning a witness at trial when the trial court ruled that the evidence was inadmissible. However, the trial court only excluded evidence of the aggravated kidnapping that occurred on Burrus Street and did not exclude evidence of the attempted aggravated robbery that occurred on Queen Avenue. The State referenced the attempted aggravated robbery in questioning the witness about the recovery of Mr. Logan's car and did not offer any evidence regarding the circumstances of the attempted aggravated robbery. Accordingly, the Defendant is not entitled to relief regarding this issue.

The Defendant asserts that the trial court erred in admitting evidence of the subsequent robbery of Mr. Logan because the shooting of the victim and the robbery of Mr. Logan were not signature crimes. *See, e.g. Jones*, 450 S.W.3d at 895 (providing for the admission of evidence of other crimes on the issue of identity where the defendant "used a peculiar and distinctive method in committing the crimes"); *State v. Moore*, 6 S.W.3d 235, 240 (Tenn. 1999) (providing that multiple offenses reveal a distinctive design and, thus, give rise to an inference of identity where "'the modus operandi [is] so unique and distinctive as to be like a signature'" (quoting *State v. Carter*, 714 S.W.2d 241, 245 (Tenn. 1986)).

The trial court, however, did not admit the evidence on the basis of signature crimes. Rather, the trial court admitted the evidence on the basis that evidence from the subsequent robbery of Mr. Logan connected the Defendant to the shooting of the victim, which is a completely different basis upon which to admit evidence of other bad acts when the material issue is identity. *See, e.g. State v. Howell*, 868 S.W.2d 238, 254-55 (Tenn. 1993) (holding that in a murder trial, the trial court properly admitted evidence of a subsequent robbery and shooting in Oklahoma and a shoot-out with police in Florida when the defendant used the same gun in all three offenses, the defendant utilized the same vehicle in the Tennessee and Oklahoma offenses, and the shoot-out in Florida established flight); *State v. Dominique Greer*, No. E2015-00922-CCA-R3-CD, 2017 WL 2233647, at *13 (Tenn. Crim. App. May 17, 2017) (holding that in a felony murder trial, the trial court properly admitted evidence of a prior aggravated robbery of a separate victim during which the defendant took the victim's cellular phone and wallet when the defendant utilized the cellular phone in the commission of the felony murder and left the robbery victim's wallet in the location where the defendant told a witness he had hidden the gun); *State v. Brandon Churchman*, No. W2013-00175-CCA-R3-CD, 2014 WL 12651043, at *9-10 (Tenn. Crim. App. Apr. 28, 2014) (concluding that in a felony murder trial, the trial court properly admitted evidence of a prior aggravated robbery and attempted murder of a separate victim during which the defendant took the victim's distinctive vehicle and shot him when the defendant utilized the same gun and the distinctive vehicle in committing the felony murder).

The Defendant's identity as the person who shot the victim was the primary issue at trial. Mr. Newsom identified the Defendant as the shooter and stated that the Defendant took the gun with him when he fled the scene. Evidence linking the same gun used to shoot the victim to an aggravated robbery committed twelve hours later during which Mr. Logan's car was stolen and the Defendant's DNA later was found inside the car was relevant to the issue of identity. The evidence also was relevant to corroborate Mr. Newsom's testimony. *See State v. Shaw*, 37 S.W.3d 900, 903 (Tenn. 2001) ("[T]here must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it….") (citations omitted). Because Mr. Newsom was the only witness who specifically identified the Defendant as the victim's shooter, other evidence linking the Defendant was highly probative. The trial court did not apply an incorrect legal standard or reach a decision that was against logic or reasoning when the court concluded that the probative value on the issue of identity, which was extremely high, was not outweighed by the danger of unfair prejudice. Accordingly, the trial court properly admitted the evidence.

### III.  The Admission of Hearsay Evidence from a Police Report

The Defendant maintains that Mr. Logan's testimony about the content of a police report reflecting Mr. Logan's description of the clothing the perpetrators of the aggravated robbery were wearing was hearsay within hearsay and violated his confrontation rights.  The State responds that because the Defendant failed to object on these grounds at trial, his claims are limited to plain error review and that the Defendant failed to meet his burden of establishing plain error.  We agree with the State.

On direct examination at trial, Mr. Logan testified that he believed one of the perpetrators was wearing a red shirt.  Defense counsel then questioned Mr. Logan extensively on cross-examination regarding the perpetrators' clothing.  Mr. Logan testified that he did not recall at trial the color of the shirts that the men were wearing but that if he told officers following the robbery that one of the men was wearing a red shirt, his statement was likely correct.  Mr. Logan agreed that both men were wearing black hoodies and stated that while he was able to see the shirts that the men were wearing underneath their hoodies, he could not recall the shirts at the time of trial.

On redirect examination, Mr. Logan testified that he recalled providing the police with a description of the perpetrators' clothing following the robbery.  He agreed that if he told officers that one of the men was wearing a red zip-up hoodie and that the other man was wearing a black and white zip-up hoodie, that information would have been correct.  When the prosecutor asked Mr. Logan whether "it would be fair to say that one of them did have a red zip-up hoodie on," defense counsel objected, stating, "if the State has got a report to show him of what he said then, I think he can show it to him and ask him to identify it."  The prosecutor handed Mr. Logan the police incident report and had him review it.  The prosecutor asked Mr. Logan what the report stated about his description of the perpetrators' clothing, and Mr. Logan read from the report that one man was wearing a black zip-up hoodie and that the other man was wearing a "[r]ed/white zip-up hoodie."  When asked whether the report refreshed his recollection as to what the perpetrators were wearing, Mr. Logan responded, "I mean, I can't say that I exactly remember now, but if I told them that, that's what they had on."

The admissibility of evidence is within the sound discretion of the trial court, and its decision will not be disturbed on appeal absent an abuse of discretion.  *See Pylant v. State*, 263 S.W.3d 854, 870 (Tenn. 2008).  An abuse of discretion occurs when the trial court applies an incorrect legal standard, reaching an illogical or unreasonable decision, or bases its decision on a clearly erroneous assessment of the evidence.  *State v. Mangrum*, 403 S.W.3d 152, 166 (Tenn. 2013) (citing *Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010).

The Defendant failed to object at trial on the basis that the State's questioning of Mr. Logan about the contents of the police report called for testimony that constituted hearsay within hearsay and violated the Defendant's constitutional rights. Therefore, the issues are waived. *See* Tenn. R. App. P. 36(a); *see also State v. Smith*, 24 S.W.3d 274, 280 (Tenn. 2000) (providing that when a defendant fails to object on the basis of inadmissible hearsay, "the evidence becomes admissible notwithstanding any other Rule of Evidence to the contrary, and the jury may consider that evidence for its 'natural probative effects as if it were in law admissible'") (quoting *State v. Harrington*, 627 S.W.2d 345, 348 (Tenn. 1981)); *State v. Alder*, 71 S.W.3d 299, 303 (Tenn. Crim. App. 2001) ("It is well-settled that an appellant is bound by the evidentiary theory set forth at trial, and may not change theories on appeal."). The Defendant, however, asserts that the admission of the evidence rose to the level of plain error.

"When necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal." Tenn. R. App. P. 36(b). Five factors must be met before this court will conclude that plain error exists:

> "(a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is 'necessary to do substantial justice.'"

*Smith*, 24 S.W.3d at 282 (quoting *State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994) (footnotes omitted)). All five factors must be established before this court will recognize plain error and "'complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established.'" *State v. Martin*, 505 S.W.3d 492, 504 (Tenn. 2016) (quoting *Smith*, 24 S.W.3d at 283). "'When asserting plain error, the defendant bears the burden of persuading the appellate court that the trial court committed plain error and that the error was of sufficient magnitude that it probably changed the outcome of the trial.'" *Id*. at 505 (quoting *State v. Smith*, 492 S.W.3d 224, 232 (Tenn. 2016)).

With regard to the Defendant's claim that his confrontation rights were violated, we note that a defendant's confrontation rights are not violated when the declarant, in this case Mr. Logan, is a witness and is subject to cross-examination regarding his prior statements. *See, e.g. State v. Dotson*, 450 S.W.3d 1, 73 (Tenn. 2014). While the Defendant contends that the officer who prepared the report is also a declarant, the police report was not included in the appellate record, and the record does not reflect the identity

of the officer who prepared the report. Furthermore, we cannot conclude that a substantial right of the Defendant was adversely affected by the admission of the testimony or that consideration of any error in the admission of the testimony is necessary to do substantial justice in light of the other evidence connecting the Defendant to the aggravated robbery of Mr. Logan and establishing his guilt for the convictions related to the victim's death. *See Smith*, 24 S.W.3d at 282. Accordingly, the Defendant has failed to establish that the admission of the testimony rose to the level of plain error.

### IV. The State's Questioning of Detective Weeks and the Defendant on the Truthfulness of Witnesses

The Defendant maintains that the State improperly elicited expert testimony from Detective Weeks and the Defendant regarding the truthfulness of witnesses. The Defendant acknowledges that he did not object at trial but asserts that the State's questioning rises to the level of plain error. *See* Tenn. R. App. P. 36(a). The State responds that the Defendant failed to establish plain error as the State's questioning did not elicit an expert opinion and was proper under the circumstances. We agree with the State.

### A. Questioning of Detective Weeks

On direct examination, Detective Weeks testified that he interviewed Mr. Newsom but did not provide any testimony regarding Mr. Newsom's statements during the interview. On cross-examination, defense counsel questioned Detective Weeks regarding the different versions of the events of the shooting that Mr. Newsom provided during the interview before he implicated the Defendant as the shooter. On redirect examination, Detective Weeks agreed that Mr. Newsom initially was not truthful and that Detective Weeks believed the final version of the events provided by Mr. Newsom, explaining that Mr. Newsom implicated himself in his final statement and that the statement was consistent with other evidence gathered by the officers.

The Defendant contends that Detective Weeks's testimony that he believed Mr. Newsom's final statement constituted an inadmissible expert opinion. Tennessee Rule of Evidence 702 states that "[i]f scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise." If the witness is not testifying as an expert, however, "the witness's testimony in the form of opinions or inferences is limited to those opinions or inferences which are … (1) rationally based on the perception of the witness and … (2) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue." Tenn. R. Evid. 701(a). "'The

- 23 -

distinction between an expert and a non-expert witness is that a non-expert witness's testimony results from a process of reasoning familiar in everyday life and an expert's testimony results from a process of reasoning which can be mastered only by specialists in the field.'" *State v. Walter Williams*, No. W2009-02438-CCA-R3-CD, 2011 WL 2306246, at *4 (Tenn. Crim. App. June 7, 2011) (quoting *State v. Brown*, 836 S.W.2d 530, 549 (Tenn. 1992)).

The Defendant does not cite to any authority to support his claim that Detective Weeks's testimony constituted an expert opinion under Rule 702. Rather, this court has analyzed challenges to testimony by officers regarding the truthfulness or untruthfulness of the statement of a witness or a defendant as a lay opinion under Rule 701. *See, e.g. State v. Petr Pompa*, No. M2016-00193-CCA-R3-CD, 2017 WL 1014529, at *8-9 (Tenn. Crim. App. Mar. 15, 2017); *State v. Percy M. Cummings*, No. W2001-01721-CCA-R3-CD, 2002 WL 1483215, at *6 (Tenn. Crim. App. Mar. 21, 2002). The Defendant does not challenge Detective Weeks's testimony as improper lay opinion testimony pursuant to Rule 701. The Defendant has failed to establish that the admission of the evidence breached a clear and unequivocal rule of law and, thus, is not entitled to relief on this issue. *See Smith*, 24 S.W.3d at 282.

## B. Questioning of the Defendant

On cross-examination, the prosecutor questioned the Defendant regarding how his testimony on direct examination could be reconciled with the other evidence. The prosecutor asked the Defendant whether he contested Mr. Newsom's claim that Mr. Newsom never touched the gun during the robbery, and the Defendant replied that he did not know whether Mr. Newsom possessed a gun because the Defendant was not present when the robbery occurred. The prosecutor questioned the Defendant about whether he contested the ballistics evidence and whether he believed the forensic scientist's testimony. The Defendant offered various responses, claiming that he did not understand the question and the meaning of "contest" and then agreeing that he believed the forensic scientist was being truthful. The prosecutor also asked the Defendant whether he contested Mr. Logan's testimony and whether he believed Mr. Logan testified truthfully. The Defendant responded that Mr. Logan was unable to recall details of the robbery and omitted details when testifying.

The propriety, scope, manner, and control of cross-examination rests within the sound discretion of the trial court. *See State v. Dishman*, 915 S.W.2d 458, 463 (Tenn. Crim. App. 1995); *State v. Barnard*, 899 S.W.2d 617, 624 (Tenn. Crim. App. 1994). The State "has the right to cross-examine defense witnesses … subject to the restrictions created by the applicable statutes, rules of evidence, rules of criminal procedure, and the common law rules created by the appellate courts." *Adkisson*, 899 S.W.2d at 644-45.

Furthermore, "[a] witness may be cross-examined on any issue in the case, including credibility…." Tenn. R. Evid. 611(b).

While the Defendant claims that the prosecutor elicited what amounted to an expert opinion regarding the credibility of witnesses, the Defendant does not cite to any authority supporting his claim. Rather, the prosecutor's questioning, when viewed in its context, was a continuation of the prosecutor's efforts to challenge the Defendant's testimony on direct examination and its inconsistencies with other evidence. The Defendant has failed to establish that the prosecutor's questioning breached a clear and unequivocal rule of law and, thus, is not entitled to relief on this issue. *See Smith*, 24 S.W.3d at 282.

## V. Cross-Examination of the Defendant

The Defendant contends that the prosecutor improperly questioned him on cross-examination regarding his invocation of his right to remain silent and his failure to produce evidence and witnesses at trial. The Defendant acknowledges that he failed to object to the line of questioning at trial and that, therefore, this court's review is limited to plain error. *See* Tenn. R. App. P. 36(a). The State responds that the Defendant failed to establish plain error. We agree with the State.

### A. Right to Remain Silent

The Defendant challenges the following exchange as the State's questioning him regarding his decision to exercise his right to remain silent:

Q. I mean, you are facing a murder charge, Mr. Newsom. You would agree that is pretty serious, right?

A. Yeah.

Q. If this was the truth, then why weren't you shouting it at the roof tops when this whole thing began?

….

Q. Okay. So if Cayce Boy is the one that did it, why didn't you talk to the police to say I think it was Cayce Boy is the one that committed this murder?

A. Sir, I was already in jail at the time, sir.

- 25 -

Q. But you had an opportunity to tell Detective Weeks that; do you remember that in the interview?

A. At the time I didn't know.

….

Q. Okay. Would you agree with me that you could have called or called the police at any time to tell them that that was actually what happened before this happened?

A. Sir, can you ask the question again?

Q. Would you agree with me that you could have called the police during the pendency of this case and told them that it was Cayce Boy that did all of this and that you had already left and didn't even hear a gunshot?

A. No, I couldn't call the police and tell them that.

Q. And why is that?

A. Because I wasn't there and I didn't see it happen.

Q. You did what?

A. I said I wasn't there and I didn't see it happen. I just knew—I just went off what my cousin told me.

Q. Well, you could have told the police that at least, right?

A. Yes, sir.

Q. But you didn't?

A. Yes, sir.

Q. And we are just only hearing all of this now?

A. Yes, sir. It's my turn—

Q. Two and half years?

A. It's my turn to speak, so…

While a defendant has the right to remain silent, "[o]nce a defendant decides to testify," he "cast[s] aside his cloak of silence," and the Fifth Amendment allows him to be subjected to at least some degree of impeachment based upon his prior silence. *Jenkins v. Anderson*, 447 U.S. 231, 238 (1980). The Fifth Amendment, therefore, permits impeachment of a defendant "by use of prearrest silence." *Id.* at 240. However, under the Due Process Clause of the Fourteenth Amendment, a defendant may not be impeached at trial for choosing to invoke his Fifth Amendment right to remain silent after receiving *Miranda* warnings. *Doyle v. Ohio*, 426 U.S. 610, 619-20 (1976); *State v. Dotson*, 450 S.W.3d 1, 55-56 (Tenn. 2014). The United States Supreme Court recognized that the reasoning behind *Doyle* was that "it is fundamentally unfair to promise an arrested person that his silence will not be used against him and thereafter … us[e] the silence to impeach [him]" or otherwise "make use of the … exercise of those rights in obtaining his conviction." *Wainwright v. Greenfield*, 474 U.S. 284, 292 (1986); *see Dotson*, 450 S.W.3d at 56. *Doyle*, however, "'does not impose a prima facie bar against any mention whatsoever of a defendant's right to request counsel, but instead guards against the exploitation of that constitutional right by the prosecutor.'" *Dotson*, 450 S.W.3d at 56 (quoting *Lindgren v. Lane*, 925 F.2d 198, 202 (7th Cir. 1991)). For example, an officer's inadvertent testimony regarding a defendant's request for counsel did not violate *Doyle* when the prosecutor did not use the testimony to impeach the defendant or argue the defendant's guilt to the jury. *Lindgren*, 925 F.2d at 202; *see Dotson*, 450 S.W.3d at 59 (holding that an officer's "isolated references to the defendant's invocation of his right to counsel" did not violate *Doyle* when "the prosecution did not make any evidentiary use of the testimony or attempt to penalize the defendant for exercising his constitutional right").

In *Anderson v. Charles*, 447 U.S. 404, 409 (1980), the United States Supreme Court held that "*Doyle* does not apply to cross-examination that merely inquires into prior inconsistent statements." In *Anderson*, the defendant was arrested and charged with murder after he was found in possession of the murder victim's car and other personal items. 447 U.S. 404-05. After the defendant was advised of his *Miranda* rights, the defendant gave a statement in which he provided the location from which he stole the car. *Id.* at 405. At trial, the defendant testified that he took the victim's unattended vehicle from the parking lot of a tire dealership, which differed from the statement that he had provided to police. *Id.* On cross-examination, the prosecutor questioned the defendant about why he did not tell the police when he was arrested that he took the vehicle from the tire dealership. *Id.* at 405-06. In upholding the questioning, the Court recognized that the prosecutor's questions "were not designed to draw meaning from silence, but to elicit an explanation for a prior inconsistent statement." *Id.* at 409. The Court reasoned that

"[s]uch questioning makes no unfair use of silence because a defendant who voluntarily speaks after receiving *Miranda* warnings has not been induced to remain silent. As to the subject matter of his statements, the defendant has not remained silent at all." *Id.* at 408. The Court stated that while "[e]ach of two inconsistent descriptions of events may be said to involve 'silence' insofar as it omits facts included in the other version," the holding in *Doyle* "does not require any such understanding of 'silence.'" *Id.* at 409; *see Dotson*, 450 S.W.3d at 61 (concluding that a prosecutor's comment that "[w]hen [the defendant] was brought down to the police department, he could have cleared it all up[,] [b]ut he didn't" was not a comment on the defendant's exercise of his right to remain silent but was designed to "highlight the discrepancies between the defendant's post-arrest confession and admissions and his testimony at trial").

The majority of the prosecutor's questions, when viewed in their context, did not relate to the Defendant's invocation of his right to remain silent but were designed to highlight the inconsistencies between the Defendant's statement to police and his testimony at trial. However, when the Defendant testified that he did not tell the police about "Cayce Boy" during the interview because he was unaware of "Cayce Boy" at that time, the prosecutor asked the Defendant why he did not tell the police about "Cayce Boy" "during the pendency of this case." We conclude that this line of questioning was an improper attempt by the prosecutor to impeach the Defendant on the invocation of his right to remain silent, which, according to Detective Weeks's testimony at trial, the Defendant exercised when officers presented him with Mr. Newsom's statement during the interview.

However, we also conclude that the Defendant has failed to establish that consideration of the error is "necessary to do substantial justice" or that his substantial rights were adversely affected as to rise to the level of plain error. *See Smith*, 24 S.W.3d at 282. The Defendant's contention that a third person named "Cayce Boy" was the shooter is inconsistent with the other evidence presented at trial. Mr. Newsom testified that implicating "Cayce Boy" was the Defendant's idea, and the Defendant's letter to Mr. Newsom is consistent with Mr. Newsom's testimony. In light of this evidence, as well as the evidence presented at trial establishing the Defendant's guilt, we conclude that the prosecutor's brief questioning regarding the Defendant's invocation of his right to remain silent was harmless beyond a reasonable doubt. Therefore, the Defendant failed to establish that the prosecutor's questioning rose to the level of plain error.

### B.  Failure to Produce Evidence and Witnesses

On cross-examination, the Defendant testified that he was at Mr. Darrell Pickett's home prior to the victim's shooting when Mr. Newsom contacted him about selling the victim drugs. The prosecutor questioned the Defendant regarding whether Mr. Pickett

was present and would testify at trial, and the Defendant identified Mr. Pickett in the courtroom. The prosecutor also questioned the Defendant whether he obtained his cell phone records to verify his testimony that he and Mr. Newsom communicated with each other while the Defendant was at Mr. Pickett's home. In rebuttal, the prosecutor questioned Detective Weeks about whether he knew Mr. Pickett, and Detective Weeks testified that while he knew Mr. Pickett, he did not see Mr. Pickett in the courtroom.

The Defendant also testified on cross-examination that the man who arrived in Mr. Logan's car prior to the accident was "Du Funny." The prosecutor asked the Defendant whether he had the man's contact information and whether the man was present to testify at trial. The Defendant acknowledged that "Du Funny" was not present at trial.

On appeal, the Defendant asserts that the prosecutor's comments on the defense's failure to produce evidence and witnesses to support his testimony effectively shifted the burden of proof to the Defendant to establish his innocence. However, similar cross-examination by a prosecutor was upheld by this court in *State v. Sean Higgins*, in which the defendant testified at his trial for driving under the influence and reckless driving that prior to his arrest, he was at a club with two friends and did not drink any alcohol. No. W2010-00779-CCA-R3-CD, 2012 WL 1494640, at *4 (Tenn. Crim. App. Apr. 30, 2012). The prosecutor then questioned the defendant on cross-examination regarding whether he saved his receipt from the club and whether he had contacted his friends or other witnesses to testify that he was not drinking alcohol at the club. *Id.* In rejecting the defendant's claim that the prosecutor's line of questioning improperly shifted the burden of proof, this court noted that the trial court instructed the jury that the State was required to prove the defendant's guilt, that the Defendant was not required to prove his innocence, and that comments by counsel were not evidence, all of which they jury was presumed to have followed. *Id.* at *5 (citing *State v. Young*, 196 S.W.3d at 85, 111 (Tenn. 2006)). This court also concluded that "the existence of the potential witnesses and their ability to testify regarding whether the [defendant] drank alcohol that night was particularly relevant" given the defendant's testimony on direct examination. *Id.*

Similarly, in the present case, the existence of potential witnesses and their ability to testify consistently with the Defendant's testimony at trial was relevant to test the credibility of the Defendant's testimony, which differed from his statement to the police. The trial court instructed the jury that the Defendant was presumed to be innocent and that the State had the burden of proving the Defendant's guilt beyond a reasonable doubt. A jury is presumed to have followed the trial court's instructions. *Young*, 196 S.W.3d at 111. The Defendant has failed to establish that the prosecutor's questioning breached a clear and unequivocal rule of law, that a substantial right was adversely affected, and that the consideration of any error is "necessary to do substantial justice." *See Smith*, 24

S.W.3d at 282. Because the Defendant has failed to establish the requirements for plain error, he is not entitled to relief regarding this issue.

## VI. The Prosecutor's Comments During Opening Statements and Closing Arguments

The Defendant asserts that the prosecutor made multiple improper comments during opening statements and closing arguments. The Defendant acknowledges that he failed to object to the comments at trial but asserts that the comments rise to the level of plain error. *See* Tenn. R. App. P. 36(a). The State responds that the comments were proper and that the Defendant failed to establish plain error.

Although the Defendant did not object to the prosecutor's comments at trial, the Defendant raised the issues in his motion for new trial. Our supreme court has applied plenary review rather than plain error review to allegations of prosecutorial misconduct during closing arguments that were raised in a motion for new trial even though the defendant failed to contemporaneously object at trial. *See State v. Hawkins*, 519 S.W.3d 1, 48 (Tenn. 2017). We conclude that the Defendant is not entitled to relief regardless of whether we employ plenary review or plain error review.

### A. Opening Statements

The Defendant challenges the following comment by the prosecutor during opening statements regarding the note written by the Defendant to Mr. Newsom while they were in jail:

> Why does this note matter? Well, that note matters, and I will submit that we will argue to you at the end of this trial, that Charvis Newsom is attempting to set up his defense with his co-defendant Quantarius Newsom in the text of that note. Why would someone, we will argue, try to set up a defense for someone who was not there; for someone that had nothing to do with this? Why would they try to blame [a] murder on a third person if they were not in fact the two people?

The Defendant maintains that the prosecutor improperly offered his personal opinion regarding the falsity of the note.

Both the State and the defendant are entitled to make opening statements at the outset of the trial. T.C.A. § 20-9-301. The purpose of opening statements is "'merely to inform the trial judge and the jury, in a general way, of the nature of the case and to outline, generally, the facts each party intends to prove.'" *State v. Sexton*, 368 S.W.3d

371, 415 (Tenn. 2012) (quoting *State v. Stout*, 46 S.W.3d 689, 713 (Tenn. 2001) (appendix), *superseded by statute on other grounds as recognized in State v. Odom*, 137 S.W.3d 572, 580 (Tenn. 2004)). These statements "must 'be predicated on evidence introduced during the trial of the case.'" *Id*. (quoting *State v. Sutton*, 562 S.W.2d 820, 823 (Tenn. 1978)).

As argued by the State on appeal, the prosecutor's comments were made while explaining the State's theory of the significance of the letter written by the Defendant to Mr. Newsom while in jail as evidence of consciousness of guilty because it appeared to be an attempt to coordinate a cover story blaming a third person for the victim's death. The prosecutor was careful to preface the statements with "I will submit." *See Coker v. State*, 911 S.W.2d 357, 368 (Tenn. 1995) (noting that "if argument is predicated by the words 'I think' or 'I submit,' it is unlikely to be adjudged as a personal opinion"). Because the prosecutor's statements, when viewed in their context, were made while articulating the State's theory of the case and how the Defendant's note would support it, the comments were not improper.

### B. Closing Arguments

The Defendant challenges the following comments by the prosecutor during rebuttal closing arguments:

> Charvaris Newsom lies about it. Ladies and gentlemen, we didn't know until this morning whether or not he was going to testify, we would be here for another four days if I have to [dissect] all of that. We really would.
>
> You know, he remembers just enough to know that he wasn't there, that apparently he was with Darrell – Darrell Pickett who didn't testify. Ladies and gentlemen, you are fac[ing a] murder charge and finally you got your story together, the one you didn't tell the police, and the fella that you were with is sitting in the courtroom, doesn't take the stand to back you up, are you serious? Take that for what it's worth. I mean I can't, common sense, ladies and gentlemen, use it.

The Defendant asserts that the prosecutor improperly commented on the Defendant's invocation of his right to remain silent, improperly relied upon the missing witness rule, and improperly asserted his personal opinion regarding the veracity of the Defendant's testimony.

"Closing arguments serve 'to sharpen and to clarify the issues that must be resolved in a criminal case'" and enable "'the opposing lawyers to present their theory of the case and to point out the strengths and weaknesses in the evidence to the jury.'" *Hawkins*, 519 S.W.3d at 47 (quoting *State v. Banks*, 271 S.W.3d 90, 130 (Tenn. 2008)). Because counsel in criminal cases are "'expected to be zealous advocates,'" they are afforded "'great latitude in both the style and the substance of their arguments.'" *Id.* (quoting *Banks*, 271 S.W.3d at 130-31). Prosecutors, however, "must not lose sight of their duty to seek justice impartially and their obligation 'to see to it that the defendant receives a fair trial.'" *Id.* at 47-48 (quoting *Banks*, 271 S.W.3d at 131). "Accordingly, a prosecutor's closing argument must be temperate, must be based on the evidence introduced at trial, and must be pertinent to the issues in the case." *Banks*, 271 S.W.3d at 131 (citations omitted). "[P]rosecutors, no less than defense counsel, may use colorful and forceful language in their closing arguments, as long as they do not stray from the evidence and the reasonable inferences to be drawn from the evidence, or make derogatory remarks or appeal to the jurors' prejudices." *Id.* (citations omitted). Although not exhaustive, this court has recognized five general areas of potentially improper prosecutorial argument: (1) intentionally misstating the evidence or misleading the jury as to the inferences it may draw; (2) expressing personal beliefs or opinions as to the truth or falsity of any testimony or the guilt of the defendant; (3) inflaming or attempting to inflame the passions or prejudices of the jury; (4) injecting issues broader than the guilt or innocence of the accused under controlling law, or making predictions regarding the consequences of the jury's verdict; and (5) arguing or referring to facts outside the record unless the facts are matters of common knowledge. *State v. Goltz*, 111 S.W.3d 1, 6 (Tenn. Crim. App. 2003).

However, "[a] criminal conviction should not be lightly overturned solely on the basis of the prosecutor's closing argument." *Banks*, 271 S.W.3d at 131. Instead, "[a]n improper closing argument will not constitute reversible error unless it is so inflammatory or improper that i[t] affected the outcome of the trial to the defendant's prejudice." *Id.* The following factors should be considered when making this determination:

> "(1) the conduct complained of viewed in context and in light of the facts and circumstances of the case; (2) the curative measures undertaken by the [c]ourt and the prosecution; (3) the intent of the prosecutor in making the improper statement; (4) the cumulative effect of the improper conduct and any other errors in the record; and (5) the relative strength or weakness of the case."

*State v. Buck*, 670 S.W.2d 600, 609 (Tenn. 1984) (quoting *Judge v. State*, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976)); *see also Goltz*, 111 S.W.3d at 5-6.

We disagree that the prosecutor's comments related to the Defendant's exercise of his right to remain silent. Rather, the comments were designed to highlight the inconsistencies between the Defendant's statement to police and his testimony at trial and, therefore, were proper. *See Anderson*, 447 U.S. at 408-09; *Dotson*, 450 S.W.3d at 61. With regard to the Defendant's remaining claims, we note that the prosecutor's closing and rebuttal arguments amassed a total of fifty-one pages of transcript, and the Defendant challenges only a small portion of those arguments. According to the Defendant's testimony at trial, Mr. Pickett would not have exonerated the Defendant if he had testified but would have merely corroborated the Defendant's claim that he was with Mr. Pickett when Mr. Newsom initially contacted him about the victim. In light of the proof of the Defendant's guilt presented at trial and the isolated nature of the prosecutor's comments, we conclude that even if the comments were improper, the comments were not so improper or inflammatory that they affected the outcome of the trial. *See Banks*, 271 S.W.3d at 131.

## VII. Cumulative Error

The Defendant seeks relief based upon cumulative error. However, the Defendant has failed to establish any error entitling him to relief when considered either individually or cumulatively.

## CONCLUSION

Upon reviewing the record, the parties' briefs, the oral argument of the parties, and the applicable law, we affirm the judgments of the trial court.

_____
JOHN EVERETT WILLIAMS, PRESIDING JUDGE